On the docket today is No. 5-19-0028, Simmons v. Beckett. Counsel for the appellant, you may proceed. Good afternoon. May it please the Court? Counsel? This case involves various... Could you state your name? Yeah, I'm sorry, Jean Aubuchon. For the respondent appellant, Jennifer Beckett. This case involves modifications of various parenting orders, including parenting time, what used to be, of course, custody and visitation, and also of child support issues. The first point that we address is the trial court modifying the parenting time as to provide the father, Mr. Simmons, with alternating weeks during the summer. It is our contention that Mr. Simmons did not prove that there was a change in circumstances that was not anticipated in the original parenting order, the parenting plan, and that directly affected the needs of the child. The only change in circumstances that Mr. Simmons ended up testifying to that actually existed was that he would be missing seven hours of parenting time per week because the child started school. Our first contention is that a child starting school certainly is not something that isn't unanticipated. With all children, it would be anticipated that they would be attending school at some point. And the, I mean, both parents are missing time because a child starts school. And I don't believe that there is really evidence that those seven hours per week affected the minor child's needs, which is another part of that first component of modifying parenting time. The second component is the best interests of the child, that the modification is necessary to serve the best interests of the child. And it is our contention that the evidence actually supported the opposite conclusion, that this modification is not in the child's best interests. The evidence showed that this is a child who has ADHD, and he needs consistency in his life. He's a five-year-old kid starting kindergarten at that point in time, and there was expert testimony that this child definitely needed consistency. Well, that's the expert testimony of Dr. Clipper? Yes, it was. And all of his information came from your client. Is that correct? That is correct, yes. He did meet with both parents, but apparently most of the information did come from Ms. Beckett. I would like to point to In re, the marriage of Dean and In re, the marriage of Swanson that I cite in my brief. So let me let me ask you with regard to the information that the judge had before her. And this was Judge Kevlin. Is that correct? Yes. And so the information she had before her was essentially provided by Ms. Beckett in regards to the child's condition before and after visits with dad and what the child needed or didn't need, along with Dr. Clipper's information that he provided to the court as well, which we often agree that he got most of his information from Mrs. Beckett as well. So with the standard of review that we are faced with in a case like this, why didn't Judge Kevlin believe, as it appears she did not, your client's testimony with regard to the child's well-being? I really don't think that that's necessarily the case. I think she did believe, in fact, she stated that his original desire was to have week-on-week-off all year round. And she stated that there's no way that I'm going to give week-on-week-off to a kid who has ADHD and needs consistency. So she did believe that. She did believe that testimony. But then your client asked for no visitation with father at some point? No, not for that. For holidays and what was the other thing that she requested? Weeknights. Weeknights and holidays. And what the court ended up doing was giving week-on-week-off during the summer? Correct. And didn't modify the holiday schedule, is that correct? That is correct. So then with regard to what your client was asking for as a court and what the court gave, apparently the court didn't see things the same as what Ms. Beckett saw them in regards to the child's needs, at least for the summer? For the summer, certainly. But there's nothing in the record that states that just because it's summertime, a child with ADHD doesn't also need consistency. I don't believe that Dr. Klipper's testimony made any differentiation between summer and non-summer. I agree with you. And this child still has ADHD. I agree with you. And that's what I'm saying. Right. What was it that the court based her reasoning on for giving week-on-week-off when Dr. Klipper and Ms. Beckett didn't feel that that was appropriate for the child? Well, from looking at the entire record, in my opinion, it is because he was missing that time that the child would be in school. And she was trying to make up for that time. I believe it was a little bit of a drastic measure to make it up, you know, week-on-week-off. It just really doesn't match, number one, her own statement, and number two, the evidence of this child's needs. I think that it's apparent in reviewing the entire record that all along this child's needs have not been the first concern. It's been Mr. Simmons' work schedule and his social life, and that comes up frequently in the record. Well, there's also in the record quite a bit of testimony with regard to, you know, I believe that Ms. Beckett in her various motions and filings had suggested that Mr. Simmons had not utilized the visitation that he had. And that was true, yes. But there's also quite a bit of testimony with regard to Mr. Simmons' work schedule and conflicts, and it did not appear to me in reading the file, the briefs and the record, that he was neglectful as sometimes in family we see where the parent just doesn't show up, doesn't ask for additional time, doesn't ask for modifications. It seemed that he consistently asked for modifications that Ms. Beckett refused. Well, that was only regarding the Thursday nights when he was working nights. That was really the only point that was brought up with regard to that. There was testimony, and in fact he stated on some weekends he didn't do it because he wanted to go to Mardi Gras. He wanted to go to Homecoming. His social life was more important than the time with his son. He also never exercised his two weeks during the summer that he had, for all of those years, aside from going on a vacation with Jennifer and her other children for one week. But during those years he never exercised that time. There were numerous holidays that he never exercised. And it wasn't due to work. And I believe that Jennifer's mother testified that she watched Cole for Matt sometimes, and it wasn't because of work. It was because he had other things to do. You know, we would all love to have the luxury of having our children at our convenience, but that's not the case for most parents. I think that giving somebody then week on week off during the summer in order to somehow make up for this time that he's lost, even though there are numerous other instances when he didn't exercise his time, other than those Thursday nights when he was working nights, the record is replete with those. So all those times that he had requested modifications from Jennifer, it was only on those Thursday nights when he was working nights. Correct. Correct. That is my understanding. And also the record would reflect that there were times when she did offer other time from the Thursday nights, but he declined them. She consistently offered him Sunday nights when he wasn't working. But again, he declined those because that was his time to go out with his friends, and he said that. Kind of skipping forward since we've pretty much discussed the family time issues. What is the standard of review? It's manifest rate of the evidence. Abuse of discretion. And abuse of discretion, yes. So what did this trial judge do that used the judge's discretion or was against the manifest rate of the evidence? Well, first of all, I believe that it's against the manifest rate of the evidence to find that there was a change in circumstances not anticipated by the original order that directly affected the needs of the child. I don't see that in there. I think that the evidence was that this was something that was anticipated, and also this was changing circumstances with the seven hours a week. There was no showing of how that affected the child. The only person that it had an effect on was Mr. Simmons. So I believe that is against the manifest rate. In reading the brief, and particularly that argument, that this wasn't a detrimental effect to the child to leave seven hours a week with the father, but it was only a detriment to the father to leave seven hours with his child, are you suggesting that the child received no benefit from being with his father for those seven hours? No, but it's, I mean, they're both parents. My client obviously is receiving less, even more or less, parenting time as a result of this child starting school. But what can we do to make that right? We can't. There's only a certain number of hours in a day and days in a week. Correct, but under the custody arrangement, your client had the child show custody and had a much greater period of time with the child than did Mr. Simmons. So his seven hours would effectively amount to more of a loss while the child's in school than it would to another who's got more time to give. Is that not correct? Well, I don't know. Relatively speaking, I mean, she's going to be missing seven hours every day while her child is in school, you know, and she's working, you know, she misses that time too. The schedule was done, I mean, around Mr. Simmons' schedule and based on really nothing else. She got none of that latitude. But as far as the modification serving the best interests, I still believe that it is an abuse of discretion and against the manifest weight of the evidence. When you look at all of the evidence about this child's needs, put aside his parents' needs for a little bit and see what's good for this child. There was, I'm sure there was a reason why the schedule was done the way that it was initially. So we are looking at a modification, the change in circumstances, the best interests of the child. I would just like to briefly address the child support issues. The first one is the failure to adjust Ms. Beckett's income because she has other children in her home. The statute says that the income of the parent of other children shall be adjusted. And the, you know, the calculations make concessions for that adjustment. That was not done in this case. My client has two children in her care that she is providing care for and it was not adjusted pursuant to the statute. Wasn't the, wasn't the court's, correct me if I'm wrong, wasn't the court's reasoning for that the fact that she wasn't requesting or seeking child support from the other two children's fathers? Well, the one father is deceased. And the other one, no, she was not seeking court-ordered support from him, but he was assisting with the child. But I don't see anywhere in the statute where there is a you shall account for this, but not if somebody is paying child support for this child. I don't believe that that should enter into the equation under the statute. And this is new ground that we're working under. But there wasn't a child support order for the other child. And there was testimony that she was using some of the money that that father gave to his child for a vehicle for her own purposes. Well, and obviously for her child too. I believe it was for her car. Yes, for her car. So the child has a car and she has a car. No, the child was not driving it when he was paying that. It was not for the child's car. It was to help her with her car payment to ease, you know, her financial burden as she's caring for this child. With Judge Moore's presiding permission, we have no other cases this afternoon. And I think if you want to advise on something else, I've interrupted her enough today with questions that she has. If I could give the other side an opportunity to extend their time if necessary. Sure. And I'm sure when you've heard enough of me, you'll let me know. Then the, but I think on that issue, the This is not an offer to speak on an unlimited basis. Correct. I'll try and keep it brief. Just basically that on that issue, we are treading on new ground here because that is a new part of the statute that allows for that. So I don't have much. I don't have anything to go off of as far as appellate decisions on that point. With regard to her income and child support. I mean, there was testimony of different sources of income besides the father who was giving her money for the son and so forth. Explain to me where the money from the friend at the bar comes in. And what was it that she was concerned about? Legality wise, what the legal issue of answering honestly was. So I just answered, I don't know. Yeah. In that deposition. It's not like it's something that she and I talked about beforehand. But I think she was afraid that she would get her friend in some kind of trouble if she said that he was loaning her this money. I didn't see it as a loan. Well, I mean, they did the court and that's fine. And we don't disagree with that. The court took that and imputed that income to her. We are not appealing that. What was she being paid for? Well, she said that it was a loan because she was having financial difficulties and he was helping her out. But there was no indication that she was paying any of it back. I think right before the trial, she made some payments to him. I believe there was testimony in the second portion of the trial that she may have paid him a hundred, couple hundred dollars back. But there's no written evidence of it or anything like that. And I don't have any quarrel with the court imputing that income to her. But I believe that was resolved with that. But as far as, I mean, the court properly, I think, separated out the two periods and determined the incomes. I don't have a quarrel with that. The only thing I have a quarrel with is not adjusting the income for multifamily and not dividing, well, not making Mr. Simmons pay some of the school and extracurricular. I believe that's also an abuse of discretion standard. But I think it is an abuse of discretion to not make a parent help pay for school and extracurricular. But the court did state its reasons for not awarding those things. Right. That's why I asked the decision maker. So your understanding of the statute, what is the discretion that the court has in that regard? Well, the discretion is whether or not to award that. And I'm solely talking about school and extracurricular. Right. But she doesn't have any discretion over what the school expenses are going to be. I mean, she's stuck with that. If the court would have allowed something for school expenses, plus there was testimony that they put their child in football by agreement, and now she's stuck with paying for it. He's not contributing to that at all. And then the other part is the child care, which I believe once the court decides that the child care, someone should contribute to the child care, I believe there's no discretion in how that should be paid. But the statute says that it shall be prorated in accordance with the income shares. That issue was kind of muddied when the testimony of her mother was disputed with regard to who she was charging and who was paying. She was claiming she was charging both her daughter and Mr. Simmons. And then it was later found that she wasn't, or that she was only collecting from Mr. Simmons or seeking to collect from Mr. Simmons. I'm not sure. Well, she was seeking to collect from Mr. Simmons because he wasn't paying her. But there was no accounting for any payments that Ms. Beckett made to her mother either. No, there was no accounting for it. It was her testimony that she bought her mother gas. And that was really what the charges are for. If you look at how much she was charging for child care, the explanation that it's essentially her gas money from running to St. Louis over to Freeburg to care for this child, it makes perfect sense that she should be reimbursed for her gas. So then is it fair to say that Judge Keevlin could have had issues with the veracity of Ms. Beckett's testimony in regard to stating at some point that she didn't know how to answer, wasn't sure of the legal implications of answering that question honestly, so I just answered I don't know. As well as, well, Mom, I'm paying Mom for watching the kid, but I'm really not. The other two kids get watched and I'm not really paying for them either. But I said that I am paying. The veracity seemed to be an issue with regard to some of the court's decisions on some of these issues. Well, but the court never states that. The only person who states that is Mr. Simmons in counsel. Nowhere, and I triple checked the entire record as far as whether the judge said I don't believe you, I think you're lying, you are not credible. There was no mention of that at all. And it does kind of fly in the face of that if she didn't think she was credible, then why would she, you know, have imputed the income that she testified? She did testify in court that, yes, this guy gave me this money. Counsel, I'll give you one minute to wrap it up. Okay. I promise not to ask any questions. The only other thing is the attorney's fees issue. I believe under the statute of leveling the playing field that this is a prime case for that. When you look at the fact that Mr. Simmons makes four times more than Ms. Beckett and that these attorney's fees would, you know, under the case law, would seriously diminish her ability to provide for herself and her family, and that based on the disparity in incomes that he should contribute to that as well. Thank you, counsel. We'll have an opportunity for rebuttal. Counsel for Appellee. May I please report? My name is Susan Wilson. I represent Matthew Simmons, who is the petitioner appellee. I want to start out by saying a lot of the concerns I have have already been expressed by the court, and I commend you on what appears to be a very thorough reading of the briefs and the information here. I want to hit some of them, kind of the high point of them, because I think one of the key things here, and I spent a lot of time on, I think it's page 19 and 20 of my brief, going into the position of the trial judge, being able to see the people that are testifying, being able to make inferences from the testimony. You don't have to say, Jennifer Beckett, I think you're not credible. You can draw inferences from what she says, and this is probably, in my 30-plus years sitting in that courtroom, one of the classic examples which I think that those kind of cases were built on. There was a recent case in the Fifth District, I think it was March of last year, I have it marked here, but the whole point of that, one of the main points of that was the fact that the inferences that the court draws are very relevant to the standard of review. You see the person, you see what they're doing, you see their actions, you see what's going on in the courtroom, nobody, no other person other than the people there can see that, and I think that shows through, and I believe even a reading of the transcripts and a reading of everything, that shows through very clearly here what was going on. Well, in terms of, for our benefit, perhaps, you know, if Judge Keaton would have announced her, perhaps, her concerns with the credibility of any of the witnesses, that helps in our regard to see definitively. We don't have to guess at what the inference is, but it would have been nice had it been announced in the ruling. Absolutely. As to the issue of payments of child care and extracurricular activities and the payment of attorneys, I'll ask you to, you may want to address this on your court of counsel. Both of those statutes say, in the statute itself, the court may, in its discretion, as far as whether or not those fees are awarded. Isn't that true? I believe that, as far as attorneys' fees? As opposed to both payment of child care, extracurricular activities, and attorneys' fees. Okay. Well, let me address the child care. I believe that there has to be discretion of the court at all. And I know that we have a relatively new child support order, statute, but there has to be some discretion. The court has the discretion to go above the guidelines in child support. They have the discretion to go below the guidelines in this particular case and all these other issues as well. As was pointed out earlier, the child care issue, the mom, the grandmother had never charged for child care prior to this hearing. We had two hearings, one in the summer and then one later on in the fall. The judge initially, on account of a temporary order, said I'm going to have them pay 50-50 on child care because the mother introduced that she was going to get a job, which I don't believe turned out to be long-term. The judge said that and it was pointed out by the court. Then the mom starts charging $10 an hour, starts charging that, my client, and trying to collect that, doesn't collect from her daughter. She buys, gives her a card for gas, which we don't know how much, nothing. And then my client was available to watch the child because he's a week on, week off. And I really want to talk about his schedule in a minute to help you understand a little bit better about why the schedule was set up. He was available to watch the child. The grandmother kept the child. And when she turns the child over to him, she asked for the child care for that period of time. And he said I would like to have the child. I'm available. This information came out at the second trial, and I believe the court understood that there was shenanigans going on here. The mom, the grandma, and everybody, the only person paying here was my client for his son. The other two kids, there was no charge for their care. Now, they were getting up there older, but she had never, the testimony was she had never charged for day care for her grandchildren ever before this happened. As far as the attorney's fees, I believe the court made it very clear in its ruling that she said if I award attorney's fees, all I'm doing is propagating her coming back yet again. My client had fought from the time the child was born to get a few days of visitation. And then the minute that the schedule changed, rather than work with him and say, okay, your schedule now changed from a day shift to a night shift, the child had no day care, no preschool, nothing he had to attend. And my guy says, I'm coming back from a seven, 12-hour shift in a week. I'm coming home at 7 a.m. in the morning. I'm supposed to start taking care of this two-year-old at 7.30 a.m. He said, could I just sleep a couple hours? I don't feel incompetent to watch a child that's two-year-old when I've been working for, you know, 12 hours, seven days a week. Could I just wait a little bit and keep him a little longer? Absolutely not. She files and says, my guy's not taking his time. He's concerned about the safety of the child. She's concerned about gotcha. And then she files and says he's not taking his time. So with regard to what Ms. Avisham suggested, that the testimony was only concerning his Thursday evening visits, was it your understanding that the only time that he requested modification, the only time she denied it, was Thursday night visitations? Whenever he asked for some additional time. It happened that, if I could give you a little bit of background here, I think it would make it easier to understand. He works, he starts on Thursday morning or Thursday evening, depending on whether day or night. He works until the following Wednesday and then day or night. He gets up at 3 or 4 o'clock in the morning to travel the hour to the river? He's an hour, he lives in Belleville, works in St. Louis. He's a tugboat driver. He manages multi-million dollar tugboats, 12 hours a day, on the river, maritime law, federal law, drug tested all the time, very responsible, never had a problem. He does this, he comes home then, he did come home at like 6 or 7 on a Wednesday night, then the court had given him an original one all day Thursday, and then all of the weekend, and then the following Wednesday before he went back to work on Thursday. So they had maximized his time, taking it into account, you know, we have a whole night of rest before you start, then we have the weekend, which, that's when you do the fun things, then we have another quality day of Wednesday before you go back to work. The minute that he went to a night shift, she said, no, and she testified, other parents work, why can't, you know, they have to get up after not having much sleep. True, that's true, but in this particular case, there was another alternative. The child had nowhere to be, was not in school, was not in daycare. Let dad sleep a couple hours and get confident to watch a baby that's walking around, toddling around, and mom said no, no, no. And at the time that she was saying no, no, no, and left out of the garden, she was not working at that time. Right, it wasn't like she'd have to pay daycare or anything, because most of her life she has not worked. If she does work, it's bartending a night here and a night there. He had also asked for other times, especially with regard to things, special occasions and all that kind of things, but the only time that she would offer the child to him extra, and it only happened five times, the best we could tell, was on Sunday night. She said she voluntarily took a shift at the bar, she wanted him to watch the child on Sunday night, and he had a standing, two of them had lived together for a long time, he had a standing every other Sunday night. He went out to his buddies. That's his life. That was his fun time. She took a job on Sunday night and offered him Sunday night five times and said, look, he doesn't want any time with the child. If you saw her conduct and saw what she's doing, she's very calculating, very manipulative. If you look at the testimony with regards to the widower guy in my exhibit 16, the man's pulling up to the bar, honking the horn, he says, and giving her thousands of dollars a month because she needed it. She has a way of thinking ahead and trying to figure out how he can get money and spend very little time working. My client had lived with her, and she had the two older boys, and he testified he was a father to them because she did everything in her power to keep the other fathers out of their life. Now, the one died, and as a result, she got $1,059 in Social Security for the son, and she got $1,059 in Social Security for herself as well. So she's got over $2,000 from this. Then the older son, she did, according to my client's testimony in the record, she did everything she could do to keep him from seeing the child to the point she never took him to court for child support because then she could say, if you don't give me what I want with my time with the child, I'll take you for child support. So they had this sweetheart deal. He'd pay her car payment, her car payment. So she has $2,000 coming from this one guy. She has a car payment coming from the other. She has about $1,000 coming from my client in child support, which, by the way, changed almost nothing when we did the new order. She has $1,000-plus coming from the widower, coming to the door, knocking or whatever. And I'm sorry if I'm not answering that, but she asked for it. And then he asked for other times, but the primary one was, please give me a little time to sleep on Thursday and then let me keep him overnight on Thursday rather than to 6 o'clock or 7 o'clock, whatever the time was. So, again, she uses that to say he's not interested in seeing his child. And it was brought up about Dr. Klipper and the ADHD. If you look at what happened here, we didn't really modify the amount of time my client had with the child. The court rescheduled it to have longer periods of consistent time, which I think anybody who has any experience with ADHD knows that longer periods of consistent time are far better than a day here, than a weekend here, than a day here. And so she left him a little bit of time during the week, during the school year, but just basically he has every other weekend. And she said, I think it would be disruptive overnight during the week of the school year to have him going to school from a different home. So I'm going to leave a little bit of time in the afternoon and the evening, but I'm going to give him some quality time in the summer, the week that he's off all week. So this man can devote the entire week to his son. He doesn't work. He doesn't have anything that he's doing. He can devote the whole week to him. It's consistent. It's regular. It's totally consistent with what Dr. Klipper said with regard to what's best for the child in this particular case. A couple of points. I want to give a little background about my client. Both these parties, I stay in their mid-30s. My client is a blue-collar, hard-working guy. He has a very simple home that he owns with some acreage around it. And it's in the city but has a little bit of acreage. He built a playhouse for his son. He and his father did. He loves his son. He wants to work hard and then he wants to spend time with his son. He doesn't want all the drama. He's constantly being bombarded by this mom who says, I want your $1,000, but I don't want you to spend time with my son. As was pointed out, she said, All I want him to have all year round is every other weekend with this child. That's her idea of quality time. But it's also consistent with what he saw with the other two boys. She wants the money. She wants the control. But she doesn't want to share the child. My client fought from day one knowing this is the way she is. He fought to be able to have a relationship with his child. That's all he wants. He doesn't want to fight anybody. He doesn't want to cause trouble. He paid a large amount of support. He never complained once. He's still paying a large amount of support. He just wants to be left alone and enjoy the time with his child. Everything she does is to hinder that. Is that where the testimony comes in about the FaceTiming and the phone calls during his visits? He has two hours on a Thursday night. She's FaceTiming. She's calling him. She's doing everything. If he doesn't answer, and one of the cases I've cited in my brief, and I believe it's the Supreme Court case, but if not, it's the Fifth District case. It's talking about a mom that spent every minute of the time that the dad had calling him and FaceTiming him. And then one time she sent the police to his house. The child goes to bed at 8. She talks throughout her thing. Consistency. He doesn't have consistency. We need consistency. I put the child to bed at this time. He puts the child to bed at 8 like she asked. She calls at 9 o'clock and insists on FaceTiming. And he said the child's in bed. And so she uses that as a reason that he's keeping her away from FaceTiming. The child got some earplugs. Counsel, we know your time is up. We believe great gratitude to the felon so you can have another five minutes. And I'll be very brief. I appreciate that. There's some earplugs he needs to swim. She says, safety, safety, safety. So he says, could I have these earplugs so that I can take this his birthday weekend? Can I have these earplugs so he can go swimming? She said, no, get your own earplugs. So he calls around, goes to the doctor, makes an appointment over in St. Louis, goes to Children's, I think it is, wherever they got him, gets an appointment to get earplugs for the child on a Saturday morning so that he can swim that day for his birthday weekend. She calls, calls, calls, calls, calls. He is driving, and he testifies. I'm not going to answer the phone while I'm driving. So he gets there and he says, you know, I'm driving, I'm getting earplugs. The next thing you know, he gets a call from the police, and the police say she's turned you in for not returning calls. She fears for the safety of her child, and he's trying to replace the earplugs that she wouldn't give him that same morning. She knows what he's doing, but she does that, sends the police. So consistently, everything she does is control. I want to be in charge. I want to get the money. I want nobody else to have time unless I tell you you have time. And by the way, my idea of quality time is every other weekend all year round. This is a classic case of a parent who's trying to alienate a parent, not in the sense of any medical term or any legal term like that, but she wants nothing more than to get the money and not have him there. Two quick things. With regard to the testimony in her deposition when she said, I didn't answer that because I didn't know what the legal ramifications were, I think in my mind this tells you everything about this person. She's very consistent about saying what needs to be said, doing what needs to be done, and she will lie, she will deceive, she will do anything if she thinks that's not going to help her. In this case, she got caught. We did a deposition of the man. He first said that he didn't know how much and there was no payment plan. Then at the day of trial, he testifies, oh, yeah, she's going to pay me, and she paid me $100 last week. But the testimony changed three times within about a three-week period between her deposition, his deposition, and the trial. It kept changing to be whatever I think she thought would best help her. The woman has no ability, no veracity. Her credibility is horrible, and the judge in this case, I think, I know got it totally right with regard to her concerns and the conclusions that she drew with regard to the outcome in this case. Thank you. Thank you, Counsel. Rebuttal. Thank you. Maybe working a little bit backwards, I think that we're assuming an inference that Miss Beckett wasn't credible when, as I said, it was never stated by the court. And if she was so incredible, then you should be able to find parts of the judge's ruling that everything should have gone against her if she was just so absolutely incredible. Judge, I would like to address your point as far as the discretion to award the child care at the school in the extracurricular. It's in the statute. Right. The discretion is. But once the court said, yes, the child care should be awarded, I believe that there is no discretion as to how you divide that. The statute says it shall be prorated in accordance with the income shares. The issues about the grandmother not charging or just charging him, you have to look at all of the circumstances here. My client had just started a day job. Before that, she had worked off and on at bars as a bartender. And she did not need her mother's child care at that time. The child had been in day care. I think that's clear in the record. And that was a bill that Lister Simmons didn't pay, and he had to be ordered to pay it. Just as he paid that day care. Now that my client is working a regular day job, I think that the court exercised its discretion to have him pay. But like I said, the discretion then stops, and the statute says that it shall be prorated in accordance with the income shares. I want to set something straight. It was stated that my client only offered Mr. Simmons extra time five times. The record states on page 143 that the five times was when she offered him the Thursday overnights that he had been asking for. The record is replete with other instances where she offered him additional time and he did not take it. The reference to Mr. Rudd giving my client thousands of dollars per month, I think the court was clear. The court found that it was average of $550 a month. It wasn't thousands of dollars. There also were a few deposits that were shown in bank records of several thousand dollars. Yes, there were. So she just averaged it out so that it would limit like $500. So it wasn't all of these deposits. I believe if you really look close at the record, you'll find that some of those were from State Farm for an insurance claim. I was just referencing the ones that were in the briefs concerning the money that was from Mr. Rudd. Right. That's also, I believe that's an incorrect reference. If you look at the record, I believe that the record states that that reference to the thousands was testified that that was from State Farm. Also, it's difficult for me to address this, but really there's no proof other than Mr. Simmons and his counsel saying that Ms. Beckett kept her other son from his father and that somehow she is trying to keep Cole from his father. There are numerous times where she included him with all kinds of things for Cole, with his activities, going on a vacation with her and Cole and the other kids. That's not somebody who's trying to keep a child out of a father's life. This is all speculation as to what her motive is and all of this argument as to her bad faith. True, these people do not get along a lot of the time. And I think that the trial court pointed out that they are both guilty of this. The court read a text between these people where Mr. Simmons was doing the whole, you know, 2 o'clock in the morning, what are you doing? I'm reading. You don't read. And it went on and on and on. And she's like, leave me alone. And he wouldn't stop. He's just as guilty as she is of this drama, okay? You are not strangers to family cases where the parties have drama. And it's true on both sides. So with that said, really I think that's all that I have. Thank you, counsel. Thank you. We will take this matter under advisement and issue its decision in due course.